**United States District Court**
**District of Massachusetts**

| | |
|---|---|
| United States of America, | ) |
| | ) |
| v. | ) Criminal Action No. |
| | ) 21-10343-NMG |
| Malik D. Bean-Bousseau et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM & ORDER**

**GORTON, J.**

Defendants Malik D. Bean-Bousseau ("Bean-Bousseau") and Malik D. Parsons ("Parsons") (collectively, "the defendants") have been charged by a four-count indictment with conspiracy to distribute and possess with intent to distribute 40 grams or more of fentanyl and 500 grams or more of cocaine, in violation of 21 U.S.C. § 846 (Count 1), possession with intent to distribute 40 grams or more of fentanyl and 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(ii) and (B)(vi), as well as aiding and abetting (Count 2), possession of a firearm in furtherance of drug trafficking activity, in violation of 18 U.S.C. § 924(c) (Count 3) and possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. § 922(k) (Count 4).

Bean-Bousseau and Parsons have each filed a motion to suppress certain evidence and joined in the motion filed by the

-1-

other (Docket Nos. 78 & 88).  They seek to suppress evidence obtained as a result of the installation of two video cameras pursuant to state search warrants.  The collection of that evidence led to subsequent search warrants and eventually to the four-count indictment under which defendants are now charged. For the reasons that follow, the motions will be denied.

I.    **Background**

Defendants' motions to suppress concern evidence obtained as a result of two search warrants which authorized the installation of video cameras at an apartment building.  One of those warrants, No. 2134SW0035, authorized the installation of a covert video camera in a third-floor hallway of the building outside an apartment used by the defendants ("the hallway warrant").  The other warrant, No. 2134SW0034, authorized the installation of a pole camera outdoors with views of the building's exterior and parking lot ("the parking lot warrant"). An affidavit prepared by Detective Anthony Lattanzio ("Det. Lattanzio") was submitted in support of both warrants ("the Affidavit") which were issued in May, 2021, by the Attleboro District Court.

A.  **The Apartment Building**

The video camera surveillance at issue took place in and around One Mansfield Apartments in Mansfield, MA ("One Mansfield" or "the Apartment Building").  Two residential

buildings, referred to as Building A and Building B, comprise
One Mansfield.  Both buildings are four storied and contain
approximately 50 apartment units.  Because Building A also
includes some administrative offices on the ground floor, it has
somewhat fewer apartments than does Building B.

A fenced-in parking lot is located behind the buildings and
access to the buildings and the parking lot is restricted to
individuals who have the allotted electronic key fob.  Although
defendants possessed such a key fob, it did not belong to them
but rather to Shauntae Wilson ("Wilson"), the lessee and tenant
of Apartment A311 since October, 2020 ("Apartment A311").
Defendants were not listed as tenants of the apartment but used
it frequently.

Apartment A311 is located near the middle of Building A,
which is constructed in a curve such that individuals at either
end of the building's shared hallway cannot see activity
occurring along the entire corridor.  Due to the apartment's
location, the hallway outside Apartment A311 is difficult to
observe from elsewhere along the corridor.

**B.  The Investigation**

The Affidavit explains that a man approached a property
manager at One Mansfield on or about March 5, 2021, inquired
about a "gloryhole" in Apartment A311 and expressed an interest

in booking an appointment.[1]  He purported to know about the layout and minimal furnishings of the apartment but did not know how to get there.  A property manager at One Mansfield informed the police about the incident and confirmed some of the details as to the apartment's layout.  He also told police that Wilson was the lessee but two black men with vehicles used her key fob to access the apartment frequently and Wilson had not been seen at One Mansfield since she signed the lease several months earlier.

Law enforcement identified Bean-Bousseau and Parsons based on their respective vehicle registrations.  The Affidavit includes information about each defendant's criminal history.  Bean-Bousseau had, inter alia, an open drug case arising out of an October, 2020 traffic stop where he was allegedly found with 30 grams of fentanyl on his person.  Parsons had been charged with multiple drug-related offenses, although never convicted of any, and was recorded as a member of the St. Joseph's gang.  Det. Lattanzio stated that he had "never seen an individual linked to so many" known associates.

Property management provided law enforcement with access to the parking lot and apartment buildings in March, 2021.  They

---

[1] The Affidavit defines a gloryhole as "a hole that is cut into a thin wall or other type of partition, where a man can insert his penis for sexual stimulation by an anonymous person on the other side."

conducted physical surveillance and, on April 8, 2021, a
Mansfield Police Officer stopped an unregistered vehicle being
operated by Parsons.  He was attempting to park in the One
Mansfield parking lot but was told by a property manager that he
was not on the lease for an apartment in the building and could
not park an unregistered vehicle in the lot.  A tow truck was
ordered.  While waiting for the truck to arrive, the Mansfield
Police Officer observed paraphernalia consistent with
prostitution in plain sight in the car.

In early May, a confidential source who worked at One
Mansfield told Det. Lattanzio that Bean-Bousseau had disposed of
a black trash bag in a dumpster.  Det. Lattanzio then conducted
a trash pull during which he searched through four black trash
bags in that dumpster.  Two had blue ties and two had grey ties.
Upon later review of camera footage provided by property
management, Det. Lattanzio saw that Bean-Bousseau had deposited
a black trash bag with grey ties.

One of the two bags with grey ties had trash that connected
it to a different apartment in the building.  The remaining bag
contained cellophane sandwich bags with the corners cut off.
The Affidavit explains that sandwich bags are often cut in such
a fashion in order to package narcotics in the small cellophane
pouch formed by the removed corner.  White residue in one of the
sandwich bags field-tested positive for cocaine.

On May 17, 2021, law enforcement observed Parsons leaving Building A to change his clothes in the parking lot by his car. The affidavit explains that such conduct indicated that Parsons was not using the apartment as a residence.  Bean-Bousseau drove up to Building A shortly thereafter and defendants went inside together.  After several minutes, they came out of the building and Bean-Bousseau retrieved a multi-colored package from the driver's side of his vehicle before both defendants went back into the building.  Bean-Bousseau and Parsons eventually came out of the building again, went to their respective vehicles and drove out of the parking lot.

Law enforcement followed Bean-Bousseau back to a multi-family building in Brockton where a man approached the driver's side of his vehicle.  Shortly thereafter, Bean-Bousseau drove away from the building and began driving around the neighborhoods of Brockton where he could no longer be surveilled.  The affidavit describes his behavior as being consistent with that of a drug dealer.

On the basis of their surveillance and the trash pull, on May 24, 2021, law enforcement sought and obtained warrants for the placement of surveillance cameras in the apartment hallway and at the parking lot.  Within a few days, video cameras were installed in the hallway outside Apartment A311 and outdoors near the parking lot pursuant to those warrants.  Defendants

-6-

seek to suppress the evidence obtained as a result of those warrants.

## II.   **Motions to Suppress**

The pending motions to suppress present two principal issues.  First, defendants contend that video camera surveillance of the parking lot adjacent to the Apartment Building and, especially, of the door to the apartment were illegal searches under the Fourth Amendment to the U.S. Constitution.  If they were not, defendants have no standing to suppress the evidence yielded by those cameras.  Second, defendants submit that the underlying search warrants were not supported by probable cause.  The government rejoins that it was not required to procure the warrants at issue here and, even assuming that it was, there was probable cause for the warrants to issue.

The parties also dispute the applicability of the Leon good faith exception. See United States v. Leon, 468 U.S. 897 (1984). Finally, defendants, in Bean-Bousseau's motion, request a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978) ("a Franks hearing").

**A.  Whether There Was a Fourth Amendment Search**

   **1.  Legal Standard**

The Fourth Amendment protects the

> right of the people to be secure in their persons,
> houses, papers, and effects, against unreasonable
> searches and seizures.

U.S. Const. amend. IV.

In order to show that his Fourth Amendment rights were violated, a defendant must demonstrate that the government conduct at issue contravened his reasonable expectation of privacy. See United States v. Bucci, 582 F.3d 108, 116 (1st Cir. 2009); Carpenter v. United States, 138 S. Ct. 2206, 2213 (2018). A reasonable expectation of privacy consists of two components. First, that the defendant "has exhibited an actual, subjective expectation of privacy." Bucci, 582 F.3d at 116 (quoting United States v. Rheault 561 F.3d 55, 59 (1st Cir. 2009)).  Second, that the defendant's expectation "is one that society is prepared to recognize as objectively reasonable." Id. (quoting Rheault, 561 F.3d at 59).

   **2.  The Apartment Hallway**

The government submits that the Fourth Amendment issues in this case have previously been addressed by the First Circuit Court of Appeals ("the First Circuit").  In United States v. Hawkins, the First Circuit held that "a tenant lacks a reasonable expectation of privacy in the common areas of an

-8-

apartment building." 139 F.3d 29, 32 (1st Cir. 1998) (citation omitted).  Similarly, in Bucci, the First Circuit held that a person has no "expectation of privacy in items or places he exposes to the public." 582 F.3d at 117 (citing Katz v. United States, 389 U.S. 347, 351 (1967)).  The government explains that the video camera at issue here was installed in a common hallway outside the apartment and only captured activity that was exposed to the public.  Thus, the government contends that defendants did not have an objectively reasonable expectation of privacy in whatever was recorded.

Defendants counter that a Fourth Amendment analysis informed by recent cases requires a different result.  Bean-Bousseau and Parsons contend that the long-term surveillance of activity occurring in and around the doorway to the apartment, recorded by a video camera just a few feet from its threshold, violated their reasonable expectation of privacy.  In support of their argument, defendants cite the Carpenter decision and the concurring opinion of Chief Judge Barron in United States v. Moore-Bush, 36 F.4th 320 (1st Cir. 2022).

Defendants' reliance on Carpenter is misplaced.  That decision recognized that individuals have a reasonable expectation of privacy in the whole of their physical movements over a period of time as revealed by historical cell-site location information ("CSLI").  See 138 S. Ct. at 2217-19.  The

-9-

United States Supreme Court noted that the use of stored CSLI made it possible for the government to, in effect, retrospectively monitor the totality of the movements of anyone with a cellphone for "every moment of every day for five years". Id. at 2218.  The unflagging and omnipresent surveillance of an individual's movements at issue in Carpenter stands in sharp contrast to the surveillance of activity occurring at a single location challenged here.

Moore-Bush provides no firmer foundation for the argument proffered by Bean-Bousseau and Parsons.  In Moore-Bush, an en banc panel of the First Circuit considered a district court order which had allowed motions to suppress evidence obtained by pole-camera surveillance of the front curtilage of defendants' home.  All six judges on the panel agreed that the district court's order should be reversed but split three to three on whether there had been a search within the meaning of the Fourth Amendment. See Moore-Bush, 36 F.4th at 320-22 (Barron, J., concurring).

The concurrence of Judge Barron in Moore-Bush, in which he concluded there had been a Fourth Amendment search, does not compel the result sought by defendants here.  In extending the logic of Carpenter, which addressed the "whole of every single movement of an individual for a very long period", Moore-Bush, 36 F.4th at 332 (Barron, J., concurring) (cleaned up), Judge

-10-

Barron repeatedly emphasized that long-term surveillance of a single place may yield a reasonable expectation of privacy if such place is the "front of one's home." Id. at 335-36.  In the circumstance at hand, defendants did not reside at Apartment A311 and were not even listed as tenants on the lease.  A special Fourth Amendment consideration with respect to observing activity at the front curtilage of a home, if any, has no application here.

Because there is no special countenance for the totality of a defendant's activity in the shared hallway of an apartment building of which he is not a resident, the operative question is simply whether the location is, in fact, a common area exposed to the public. See United States v. Werra, 638 F.3d 326, 332 (1st Cir. 2011) (noting that the "typical expectation-of-privacy inquiry" focuses on "the particular location in which the evidence" was found).  That inquiry is "necessarily [] fact intensive". Rheault, 561 F.3d at 59-60 (holding that courts should not rely on a "conclusory 'common area' label") (citing United States v. Beaudoin, 362 F.3d 60, 70 (1st Cir. 2004)).

The Court finds that the shared hallway outside the apartment was a common area exposed to the public.  The hallway was accessible to other tenants and to anyone else with access to the Apartment Building.  Bean-Bousseau and Parsons, who were themselves not tenants, did not have control over the space or

-11-

the right to exclude others from it.  Although they contend that
the placement of Apartment A311 along the curved corridor made
it difficult to see from either end, any activity was still
exposed to individuals walking or standing nearby.  Indeed, the
curvature of the hallway makes it more likely that an individual
walking in it could, from the perspective of the defendants,
suddenly round the bend and observe their activities.

Defendants may have held a subjective expectation that
activity in and around the doorway of the apartment would remain
private but such an expectation was not objectively reasonable
because their activity took place in a common area exposed to
the public.  Thus, Bean-Bousseau and Parsons do not have
standing under the Fourth Amendment to suppress the evidence
obtained from the apartment hallway camera.

### 2. The Parking Lot

A similar analysis applies to the challenged surveillance
of the parking lot and building exterior at One Mansfield.
There is no indication that defendants had even a subjective
expectation of privacy with respect to their activity in the
parking lot.  That location is even more exposed to the public
than the third-floor common hallway.  Defendants had no
reasonable expectation of privacy with respect to their activity
in the parking lot or outside One Mansfield and therefore lack

standing to challenge evidence obtained as a result of the
exterior camera.

### 3. Consent

Property management at One Mansfield cooperated with law
enforcement from the beginning of the investigation and
permitted the installation of the hallway and parking lot
cameras.  The government contends that video camera surveillance
of the third-floor hallway and parking lot was therefore
consented to by a third-party with authority to do so.  Thus,
even if the surveillance did constitute a search, it was
permissible. See United States v. Matlock, 415 U.S. 164, 171
(1974).

Defendants rejoin that property management could consent to
a search of common areas but not to

> covert, continuous, retrievable recording by law
> enforcement of all activity at the front door of an
> apartment in a secluded area of a hallway over an
> extensive period of time.

This lengthy formulation of the purported search does not
alter the determinative facts that the hallway in question was a
common area and the property management in charge of that area
consented to the installation of a camera.  It is well within
the scope of "widely shared social expectations" that the
property management of an apartment building might monitor

common areas for various safety purposes. <u>Georgia</u> v. <u>Randolph</u>, 547 U.S. 103, 111 (2006).

Defendants' contention to the contrary recapitulates their assertion that there is a special Fourth Amendment solicitude for the whole of one's movements in a shared apartment hallway. That assertion finds no support in caselaw cited by defendants which holds that a landlord cannot admit guests to a leased premise without the consent of the current occupant or that a hotel manager cannot permit non-employees to enter the room of a hotel guest.  In contrast to those fact situations, property management allowed law enforcement to access common areas of a building under its control, not to access the interior of the apartment itself or an area under the exclusive control of defendants.

### B.  Probable Cause

#### 1.  Legal Standard

A magistrate judge is entitled to "great deference" as to her finding of probable cause. <u>Illinois</u> v. <u>Gates</u>, 462 U.S. 213, 236 (1983).  The decision to issue a search warrant should be reversed only if there is "no substantial basis for concluding that probable cause existed." <u>United States</u> v. <u>Dixon</u>, 787 F.3d 55, 58-59 (1st Cir. 2015) (citation omitted).

Probable cause exists when, based upon common sense and the totality of the circumstances, "there is a fair probability that

-14-

contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238.  A warrant application must demonstrate probable cause to believe that (1) a crime has been committed -- the "commission" element, and (2) enumerated evidence of the offense will be found at the place searched -- the "nexus" element. United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999).

### 2. Application

The totality of the circumstances here, as set forth in the Affidavit, demonstrated a fair probability that defendants were engaged in illegal, drug-related activity.  Furthermore, the observations set forth in the Affidavit, supplemented by the experience and analysis of Det. Lattanzio, established that evidence of such crimes was likely to be found by conducting surveillance of the third-floor apartment hallway and the parking lot.

As described above, the Affidavit contains information about the criminal history of Bean-Bousseau and Parsons that indicates both defendants had a connection to illegal, drug-related activity.  This criminal history was buttressed by physical surveillance of One Mansfield which, on May 17, 2021, revealed that defendants met up with one another, retrieved a "multi-colored package" from Bean-Bousseau's vehicle and, after

an intermediate period of time, left One Mansfield in their respective vehicles.

Bean-Bousseau drove to Brockton, met with a man in a driveway behind a building and then drove around Brockton neighborhoods inhibiting surveillance.  Det. Lattanzio explains that, according to his training and experience, such behavior was consistent with narcotics distribution.  See, e.g., United States v. Soule, 908 F.2d 1032, 1040 (1st Cir. 1990) (finding that "an experienced police officer" is capable of recognizing that certain behavior "take[s] on telling significance as to the type of cargo about to be unloaded" in the context of a drug-related investigation).

The Affidavit also describes a trash pull which indicated that drugs were being stored and packaged in the apartment. After receiving a tip that Bean-Bousseau had just disposed of a trash bag, Det. Lattanzio found sandwich bags cut in a manner consistent with the packaging of narcotics and residue which field-tested positive for cocaine in a black trash bag with grey ties.  The trash bag matched the one Bean-Bousseau had deposited shortly beforehand.

Defendants contend that the Affidavit does not establish the interval between the disposal of the trash bag by Bean-Bousseau and the pulling of the contents of the dumpster by Det. Lattanzio.  According to defendants, video evidence provided in

-16-

Case 1:21-cr-10343-NMG   Document 105   Filed 01/04/23   Page 17 of 20

discovery shows that Bean-Bousseau took the trash bag out on May 3, 2021, but the Affidavit says the trash pull did not occur until May 5, 2021.  The government responds that the May 5, 2021, date in the Affidavit was a clerical error and that the trash pull occurred on May 3, 2021.

On the basis of information contained in the Affidavit, it was reasonable for the magistrate judge to conclude that Det. Lattanzio's trash pull occurred shortly after Bean-Bousseau disposed of the trash bag in question.  With the benefit of additional information, it appears those events occurred on May 3 rather than on May 5 but the minor discrepancy in the Affidavit does not affect the substantive connection between Bean-Bousseau disposing of a trash bag with grey ties and the findings of Det. Lattanzio shortly thereafter. See Gates, 462 U.S. at 236 (holding that "courts should not invalidate warrants by interpreting affidavits in a hypertechnical, rather than a commonsense, manner") (cleaned up).

Viewed in isolation, no individual aspect of the Affidavit establishes probable cause to believe that defendants committed a drug-related crime of which evidence would likely be found at Apartment A311.  The affidavit submitted in support of a warrant application should not, however, be dissected and examined in piecemeal fashion by a reviewing court.  Rather, the proper analysis is a practical, common-sense inquiry that "takes into

-17-

account the totality of the circumstances." <u>Dixon</u>, 787 F.3d 55, 59 (cleaned up).  The totality of the conversations with property management, physical surveillance of One Mansfield, Det. Lattanzio's trash pull, observation of the defendants' conduct on May 17, 2021, and the criminal history of the defendants together establish probable cause to issue the apartment hallway and parking lot search warrants.

**C.  <u>Leon</u> Good Faith Exception**

The <u>Leon</u> good faith exception to the exclusionary rule provides that evidence obtained pursuant to a later-invalidated warrant may still be admitted if the warrant was relied upon in good faith by law enforcement.  <u>Leon</u> recognized the good faith exception because the purposes of the exclusionary rule are rarely served by applying it "in cases where officers have relied on a subsequently invalidated search warrant." <u>United States</u> v. <u>Fuccillo</u>, 808 F.2d 173, 177 (1st Cir. 1987).

Exclusion is appropriate only if "the deterrence benefits of suppression [] outweigh its heavy costs." <u>Davis</u> v. <u>United States</u>, 564 U.S. 229, 237 (2011) (citations omitted).  Still, the good faith exception should not be applied where an affiant is reckless in preparing his affidavit, <u>see</u> <u>Fuccillo</u>, 808 F.2d at 178, or where an officer executes a warrant "so lacking in indicia of probable cause" that her reliance was "entirely unreasonable." <u>Leon</u>, 468 U.S. at 923 (citations omitted).

-18-

Having already found that the challenged surveillance did not constitute a search under the Fourth Amendment and that the hallway and parking lot warrants were supported by probable cause in any event, it would be unwarranted for the Court to address the even-further-afield hypothetical of whether the <u>Leon</u> good faith exception would apply if the circumstances and findings had been different.

### D. **<u>Franks</u> Hearing**

In order to demonstrate his entitlement to a <u>Franks</u> hearing, a defendant must make

> a substantial preliminary showing that [1] a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [2] the allegedly false statement is necessary to the finding of probable cause . . . .

<u>Franks</u>, 438 U.S. at 155-56.  The defendant must make a sufficient showing as to both elements or else the request for a hearing will fail. <u>See United States</u> v. <u>Rigaud</u>, 684 F.3d 169, 173 (1st Cir. 2012) ("Failure to make a showing on either element dooms a party's hearing request.").

Defendants request a <u>Franks</u> hearing with respect to portions of the Affidavit pertaining to the May 17, 2021, surveillance of defendants and Det. Lattanzio's statement that the apartment likely functioned as a stash house for narcotics storage and packaging.  Defendants offer nothing in support of their request other than conclusory assertions that the conduct

-19-

at issue was "innocuous" and that the Affidavit exhibits a
reckless disregard for the truth.  Their unsupported rejection
of the affiant's observations and experience does not constitute
a substantial preliminary showing as to either prerequisite for
a <u>Franks</u> hearing and therefore the request will be denied.

## ORDER

For the foregoing reasons, the motions of defendants to
suppress evidence and for a <u>Franks</u> hearing (Docket Nos. 78 and
88) are **DENIED**.

**So ordered.**

                               /s/ Nathaniel M. Gorton
                               Nathaniel M. Gorton
                               United States District Judge

Dated:  January 4, 2023